JUDGE CARTER

12 CV 8989

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| and ) | RECEIVED DEC 1 1 2012 |
| STATE OF NEW YORK, ) | |
| *Plaintiffs,* ) | Civil Action No.: |
| v. ) | ECF Case |
| TWIN AMERICA, LLC, ) COACH USA, INC., ) INTERNATIONAL BUS SERVICES, INC., ) CITYSIGHTS LLC, and ) CITY SIGHTS TWIN, LLC, ) | |
| *Defendants.* ) | |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, and the State of New York, acting under the direction of its Attorney General

(collectively, "Plaintiffs"), bring this civil antitrust action to obtain equitable relief against

Defendants Coach USA, Inc. and International Bus Services, Inc. (collectively "Coach");

CitySights LLC and City Sights Twin, LLC (collectively "City Sights"); and their joint venture,

Twin America, LLC ("Twin America"), for violations of Section 7 of the Clayton Act, 15 U.S.C.

§ 18; Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 340 of the Donnelly Act, N.Y. Gen.

Bus. Law § 340; and Section 63(12) of the New York Executive Law, N.Y. Exec. Law § 63(12).

Coach, City Sights, and Twin America are collectively "Defendants."

## I.  INTRODUCTION

1.      This action challenges an illegal joint venture formed in 2009 by Coach and City Sights that eliminated competition between them and had the purpose and effect of creating a monopoly in "hop-on, hop-off" bus tours in New York City.  Each year, over two million visitors to New York City spend more than $100 million on these guided tours, which visit the city's leading attractions, allowing passengers to "hop off" the bus at attractions that interest them and "hop on" another bus operated by the same provider when they are ready to resume the tour.

2.      Prior to the joint venture, Coach, the long-standing market leader through its Gray Line New York ("Gray Line") brand, and City Sights, which commenced operations in 2005, operated hop-on, hop-off bus tours and engaged in vigorous head-to-head competition.  This competition benefited consumers in the form of fare discounts, improved service, and novel ticket packages.

3.      In late 2008, with City Sights steadily eating into Coach's market share and threatening its dominant position, Coach set out to eliminate the competition.  It approached City Sights with the idea of combining the two companies' operations to create, in Coach's words, the "sole player" in the market.  Coach planned to use the joint venture with City Sights to raise fares by 10 percent, something that each company could not do individually "due to competition" from the other.

4.      In March 2009, Coach and City Sights formed the Twin America joint venture, the creation of which eliminated the intense head-to-head competition between Coach and City Sights, gave them a monopoly with an estimated 99 percent of the market, and enabled them to implement and sustain a price increase of approximately 10 percent.

5.     The Attorney General's Office of Plaintiff State of New York promptly sought to investigate the formation of the joint venture.  But in a move the federal Surface Transportation Board ("STB") would later characterize as a potential "manipulat[ion]" of "the [STB's] processes," Defendants staved off the antitrust investigation by belatedly applying to the STB for approval of the Twin America transaction.  Such approval, if granted, would confer antitrust immunity.  After more than two years of proceedings, the STB rejected Defendants' application, finding that the formation of Twin America "created an entity that dominates the market in which it competes and has the ability to raise rates or reduce service without sufficient competitive restraints."  Confronted with the adverse STB ruling, Defendants ceased operating the nominal interstate service that had formed the basis for the STB's jurisdiction.

6.     As a result, Defendants continue to operate an illegal joint venture that has caused harm to consumers for more than three years.  During this period, Defendants have sustained the anticompetitive price increase, and there has been insufficient entry or expansion to restore the competition lost by the joint venture's formation.

7.     For the reasons discussed below, Defendants' formation and continuing operation of Twin America is likely to substantially lessen, and has actually lessened, competition in the market for hop-on, hop-off bus tours in New York City, in violation of Section 7 of the Clayton Act; unreasonably restrains trade and has unreasonably restrained trade in violation of Section 1 of the Sherman Act; violates the Donnelly Act, N.Y. Gen. Bus. Law § 340; and violates Section 63(12) of the New York Executive Law.

## II.  THE DEFENDANTS AND THE TRANSACTION

8.     Coach USA, Inc. is a Delaware corporation with its principal place of business in Paramus, New Jersey.  Coach is a wholly-owned subsidiary of Stagecoach Group plc

("Stagecoach"), a leading international transportation company based in the United Kingdom and registered in Perth, Scotland. In turn, Coach controls numerous American motor passenger carriers. Coach operated hop-on, hop-off bus tours in New York City under the Gray Line brand, which the company licensed for use in New York City from Gray Line Worldwide, an entity not affiliated with Stagecoach.

9.     International Bus Services, Inc. ("IBS") is a New York corporation with its principal place of business in Hoboken, New Jersey. The company is a wholly-owned subsidiary of Coach USA, Inc., and acts as one of its motor passenger carriers, with a focus on the New York/New Jersey area.

10.     CitySights LLC is a New York limited liability company with its principal place of business in New York, New York. CitySights LLC operated hop-on, hop-off bus tours in New York City under the "CitySights NY" brand.

11.     City Sights Twin, LLC is a New York limited liability company with its principal place of business in New York, New York. The company was formed for the purpose of owning an interest in Twin America.

12.     Twin America, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Twin America was established pursuant to a joint venture agreement executed on March 17, 2009 between IBS and City Sights Twin, LLC (the "Transaction"). Pursuant to the Transaction, Coach (through IBS) and City Sights (through City Sights Twin, LLC) contributed all of their New York City hop-on, hop-off bus tour operations and assets to the joint venture; acquired a 60 percent and 40 percent membership interest in Twin America, respectively; and equally divided management control. The joint venture agreement includes a non-compete provision whereby Coach and City Sights agreed not to compete in the

hop-on, hop-off bus tour business within 25 miles of New York City.  Twin America operates

hop-on, hop-off bus tours under both the Gray Line New York and CitySights NY brands.

### III.  JURISDICTION AND VENUE

13.     The United States brings this action under Section 15 of the Clayton Act, 15

U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, seeking injunctive and other

equitable relief from Defendants' violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and

Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     The State of New York, by and through its Attorney General, brings this action

under Section 16 of the Clayton Act, 15 U.S.C. § 26, seeking injunctive and other equitable relief

from the Defendants' violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of

the Sherman Act, 15 U.S.C. § 1; under Section 342 of the Donnelly Act, N.Y. Gen. Bus. Law §

342, seeking injunctive and other equitable relief from the Defendants' violation of Section 340

of the Donnelly Act; and under Section 63(12) of the New York Executive Law, seeking

injunctive and other equitable relief predicated on the foregoing violations.  The State of New

York brings this action on behalf of the citizens, general welfare, and economy of the State of

New York.

15.     Defendants are engaged in interstate commerce and in activities substantially

affecting interstate commerce.  Defendants market and sell their hop-on, hop-off bus tours

nationally and internationally, make substantial Internet sales to customers residing in other

states and countries, and have joint selling arrangements with tourism groups and other entities

based in other states and countries.  In addition, most customers who take hop-on, hop-off bus

tours in New York City reside outside New York State.  The Court has jurisdiction over this

matter pursuant to 15 U.S.C. §4, 15 U.S.C. §§ 25 and 26, and 28 U.S.C. §§ 1331, 1337, and

1345.  The Court has supplemental jurisdiction over the action and parties as to the State of New York's claims under the Donnelly Act and the New York Executive Law under 28 U.S.C. § 1367.

16.     The Court has personal jurisdiction over each Defendant, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).  Defendants transact business and are found within the Southern District of New York.

## IV.  BACKGROUND

### A.  Hop-On, Hop-Off Bus Tours in New York City

17.     Hop-on, hop-off bus tours visit New York City's leading attractions while allowing customers to tailor their itineraries to the places that interest them.  As the bus travels a fixed route, a professional tour guide provides information about the attractions and the city; customers may "hop off" the bus at any of the stops to further explore particular attractions and later "hop on" another bus to continue along the tour route using the same ticket.  Tickets range from one to four days of validity.

18.     The routes offered by hop-on, hop-off bus tour providers stop at many of New York City's leading attractions, including Times Square, the Empire State Building, the World Trade Center site, Battery Park, Rockefeller Center, Central Park, and the United Nations, as well as popular neighborhoods such as Chinatown, Greenwich Village, Little Italy, SoHo, and the Upper East Side.  Hop-on, hop-off bus tour providers typically operate separate "downtown" and "uptown" routes, but offer customers the ability to purchase an all-routes ticket that includes both.

19.     Hop-on, hop-off bus tour providers in New York City currently offer their tours on open-top double-decker buses.  The open-air upper deck provides customers with the ability

to observe New York City from an elevated vantage point and to enjoy unobstructed views that are not available through other means of ground transportation or on foot.

**B. City Sights Enters and Threatens Coach's Dominant Position**

20.    Coach acquired the Gray Line New York hop-on, hop-off bus tour business in 1998. At that time, Coach and New York Apple Tours were the primary providers of hop-on, hop-off bus tours in New York City. A small, family-run company, Big Taxi Tours, entered in 1999, but it operated only a handful of buses and held (and continues to hold) approximately 1% of the market. In 2000, Coach acquired many of New York Apple Tours's assets and employees after New York Apple Tours was forced out of business due to safety and traffic violations, leaving Coach as the only significant operator and allowing it to earn substantial profits.

21.    In 2005, Coach's market dominance came under attack with the entry of City Sights. City Sights was founded by an existing New York City tourism firm with years of experience primarily managing airport transportation businesses.

22.    Before City Sights could begin operating its hop-on, hop-off bus tours, it had to obtain authorization from the New York City Department of Transportation ("NYCDOT") to pick up and drop off passengers at specified bus stops. Based on congestion and traffic patterns that prevailed at the time, NYCDOT granted City Sights more than 40 bus stops for its hop-on, hop-off bus tours. The approved stops covered New York City's top tourist attractions including Times Square, the Empire State Building, the World Trade Center site, Battery Park, Rockefeller Center, and Central Park, as well as the city's most popular neighborhoods. City Sights's approved stops were typically located directly in front of the attractions and enabled City Sights to offer tour routes comparable to those offered by Coach.

23.     With key bus stops in hand, City Sights commenced operations and embarked upon a number of strategies to expand its business, establish brand recognition, and challenge Coach. City Sights competed on price, charging base fares at or slightly below Coach's rates, and its street sellers – the largest sales distribution channel for hop-on, hop-off bus tours -- could request authorization from City Sights managers to offer on-the-spot discounts as conditions warranted. City Sights developed novel product offerings, such as packages that included boat tours offered by another company. Additionally, City Sights partnered with New York City's largest hotel concierge service, Continental Guest Services ("CGS"), to sell tickets in CGS's hotels and offer hotel guests special promotions. City Sights established an array of joint marketing arrangements similar to Coach's, enabling City Sights to sell its hop-on, hop-off bus tours along with other tourism products from third-party providers at a reduced combined ticket price.

24.     In the years following its entry, City Sights purchased more buses, increasing its capacity and decreasing customer wait times. City Sights's fleet grew from eight buses in May 2005, to approximately 34 buses in 2007, to more than 50 buses by the end of 2008, and to 62 buses by March 2009. This larger fleet gave City Sights the size and scale to rival Coach's fleet of over 70 double-decker buses.

25.     City Sights's steady growth did not go unnoticed at Coach, and as City Sights ate into its rival's market share, Coach's focus on City Sights intensified. Coach monitored City Sights's fleet size and product offerings, dispatched "secret shoppers" to ride City Sights buses to gather intelligence on City Sights's service and promotions, and stationed employees on New York City's sidewalks to track City Sights passenger volume. Coach also commissioned an independent market survey to "determine what impact our main competitor City Sights is

8

having" and engaged a marketing firm to review City Sights's successful online advertising efforts and improve its own efforts in response.

26.     Coach's extensive monitoring of City Sights's expanding operations reached the highest levels of the company and its corporate parent, Stagecoach.  Coach's President, Dale Moser, who oversees approximately two dozen Coach businesses operating across the United States, personally spent hours on New York City street corners tracking City Sights's activities, reporting directly to Stagecoach CEO Brian Souter on the frequency of City Sights buses, and conducting Internet search queries at Souter's request to determine the relative placement of the Coach and City Sights websites in response to term searches.

27.     Coach routinely responded to City Sights's promotions by matching deals or reconsidering its own offerings.  For example, in February 2008, Coach matched a buy-one-get-one-free promotion initiated by City Sights.  Coach also created a comparable water tour package in response to City Sights's inclusion of a free boat tour.

28.     The intense head-to-head competition between City Sights and Coach led to numerous disputes.  For example, in August 2007, City Sights threatened to sue Coach, alleging that Coach had "engaged in a concerted series of actions" to force City Sights to "sell or terminate [its] business."  In a draft litigation complaint City Sights transmitted to Coach, City Sights accused Coach of monopolization and other antitrust law violations, specifically alleging that Gray Line "maintain[ed] market power, monopoly power and otherwise dominate[d] the relevant market."  City Sights defined this relevant market as "the Double Decker, Hop-on, Hop-off Bus Tours Market" and identified Coach and City Sights as the only current competitors in the market.  City Sights did not ultimately file the lawsuit, and City Sights and Coach continued their fierce head-to-head competition.

### C.  Coach's Plan to End Competition and Increase Prices

29.     By mid-2008, Coach was citing City Sights's growth to help explain Gray Line's
diminished financial performance in regular reports produced for Stagecoach.  Stagecoach CEO
Brian Souter had grown tired of the relentless competition with City Sights, with the two
companies matching each other's every move.  Souter no longer wanted to have City Sights as
an "enemy" and instead sought to join forces.  Accordingly, at the end of May 2008, Souter
directed Coach's management to initiate discussions with City Sights.  Starting in June 2008,
Souter traveled to New York City to meet with City Sights's President, Mark Marmurstein.

30.     With Marmurstein reluctant to exit his successful hop-on, hop-off bus tour
business, Coach and City Sights began discussing the possibility of a joint venture.  Coach
explained to City Sights, in a proposal transmitted in September 2008, that the benefits of the
combination would include "easier decision making as the sole player in [the] 'double deck'
market," and "flexibility regarding pricing."

31.     After approximately six months of negotiations, the parties agreed to a
combination that would make Marmurstein president of the combined entity, evenly split
management rights, and divide profits 60 percent to 40 percent in Coach's favor.  The parties
executed the Transaction forming Twin America on March 17, 2009.

32.     From the start of its negotiations with City Sights, Coach recognized that the deal
would enable the parties to raise prices.  In a July 2008 presentation to Stagecoach CEO Brian
Souter, Coach executives explained that one of the "City Sights Options" was to "[i]ntegrate
with Gray Line and increase fares by 10% on combined business."  As negotiations with City
Sights deepened in the fall of 2008, Coach incorporated a 10 percent fare increase into its
internal projections of the value of the deal, and shared analyses with City Sights that highlighted

the 10 percent fare increase assumptions.  City Sights, for its part, developed its own internal projections of the millions of dollars the 10 percent fare increase would yield and shared and discussed its analyses with Coach.

33.     By December 2008, the 10 percent price increase was firmly established as an essential driver of the deal.  An internal summary of the joint venture's terms transmitted from Coach to Stagecoach, for example, explained that the "[o]verall strategy is to integrate both businesses[,] drive out synergies and implement a fare increase of approximately 10%."  The price increase was also an integral part of Coach's February 2009 presentation to Stagecoach's board seeking approval for the Transaction.  A Coach executive advised its board that one of the key "benefits of combining businesses" was "[i]mproved profitability," which was driven, in part, by "assum[ing] [a] 10% fare increase."  The presentation explained that without the Transaction, there would be no fare increase "due to competition."

34.     Consistent with these projections, in early 2009, over a period of approximately two months, Defendants implemented both the joint venture and the price increase.  On February 5, 2009, at a time when Coach and City Sights were exchanging drafts of the joint venture agreement, Coach announced a fare increase of $5 for its Gray Line tours – roughly 10 percent of the price of Gray Line's most popular tour, the All Loops Tour, which increased from $49 to $54.  City Sights did not immediately match and the temporary fare disparity caused customers to flock to City Sights.  Although Coach executives noted internally that the increase had resulted in "resistance to the higher price and customer shift to [City Sights]," the implications of this shift would be fleeting as the formation of Twin America would extend the price increase to City Sights and combine the two companies' profits.  On March 17, 2009, Coach and City Sights

executed the joint venture agreement.  And on April 14, 2009, Twin America increased base fares for City Sights tickets by the same $5 amount.

35.     Twin America has sustained the price increase for both Gray Line and City Sights tours in the more than three years since its implementation.  The parties have continued to maintain both the Gray Line and CitySights NY brands in part because, as Coach explained to City Sights, "[p]olitically and competitively keeping both brands keeps the competition at bay as they continue to see two suppliers of tour services in the market and [the] City maintains the same understanding."

**D.  Defendants Attempt to Avoid Antitrust Review**

36.     Under federal law, parties engaging in a transaction involving change in control of an interstate motor carrier must apply for approval from the STB prior to carrying out the transaction.  If the STB concludes that the proposed transaction is consistent with the public interest, the transaction becomes exempt from the antitrust laws and thus immune from scrutiny by federal and state antitrust authorities.

37.     On March 31, 2009, Coach and City Sights began operating Twin America without first seeking STB approval.  In late July and early August 2009, the parties received subpoenas from the Antitrust Bureau of the New York State Attorney General's Office seeking information concerning the formation and operation of Twin America.  Almost immediately thereafter, Coach and City Sights sought STB approval for the joint venture, claiming that Twin America's operations were interstate in nature and therefore subject to STB jurisdiction. Although the STB was "concerned that the [STB's] processes may have been manipulated to avoid the [antitrust] inquiry," the STB undertook to analyze the joint venture under its "public

interest" standard to determine "whether the transaction is likely to have anticompetitive consequences that would negatively impact the public."

38.     In February 2011, the STB rejected the parties' application, concluding that the formation of Twin America yielded "a combined entity that possesses excessive market power and has the ability to raise rates without competitive restraint and otherwise conduct its operations to the detriment of consumers."  The STB concluded, among other things, that "the relevant market in which the Applicants compete is double-decker, hop-on, hop-off bus tours in NYC"; that "[a]fter the transaction, Twin America was free to decide to raise its prices – a hallmark of unrestrained market power"; that the Board "ha[d] not seen the public benefits that Applicants argue are the result of the joint venture"; and that the parties "ha[d] not satisfied their burden of demonstrating that barriers to entry are sufficiently low to discipline Applicants' conduct."  Accordingly, the STB ordered Coach and City Sights to either dissolve Twin America or cease the limited interstate service that the STB found to be the basis for its jurisdiction.

39.     Coach and City Sights requested reconsideration of the STB's order.  In January 2012, the STB denied reconsideration, affirming that "[a]fter unlawfully consummating a joint venture without the required approval, Applicants belatedly sought Board authorization for a transaction that created an entity that dominates the market in which it competes and has the ability to raise rates or reduce service without sufficient competitive restraints."  Defendants then chose to terminate their limited interstate service and withdraw from STB jurisdiction rather than dissolve the Twin America joint venture.

40.     Twin America continues to operate today and provides approximately 99 percent of New York City's hop-on, hop-off bus tours.

## V.  THE RELEVANT MARKET

41.     Hop-on, hop-off bus tours constitute a relevant product market and line of commerce under Section 7 of the Clayton Act, Section 1 of the Sherman Act, and Section 340 of the Donnelly Act.  Although a wide array of tourism offerings are available in New York City, a significant number of visitors specifically demand hop-on, hop-off bus tours and are unlikely to substitute other sightseeing experiences in response to a small but significant and non-transitory price increase.  Indeed, Twin America has profitably imposed and sustained a price increase of approximately 10 percent for more than three years.

42.     No water, air, or other ground-based tourism product or service offers a reasonably interchangeable consumer experience to hop-on, hop-off bus tours.  For example, hop-on, hop-off water tours cannot provide access to many of New York City's leading attractions because they are inland.  Bike and walking tours do not cover the same range of attractions or provide similar coverage in such a short period of time.  Bus tours with a fixed itinerary and duration do not afford consumers the same flexibility to tailor their itineraries to the places that interest them.

43.     Prior to the formation of Twin America, Coach and City Sights viewed themselves as the only meaningful competitors in the market.  They aggressively monitored and responded to changes in each other's prices and services, but did not similarly track and respond to the prices and service offerings of other types of tours.  In numerous internal ordinary course-of-business documents and in statements filed in court, City Sights and Coach each identified the other as its "sole" or "main" competitor.  City Sights even threatened to sue Coach for monopolization and other antitrust law violations based on a relevant market defined as "Double

Decker, Hop-on, Hop-off Bus Tours" and identified City Sights and Coach as the only competitors in that relevant market.

44.     Providers of water, air, and other types of ground tours do not view themselves to be in direct competition with hop-on, hop-off bus tours, and determine their prices and product offerings largely independently of the prices and product offerings of hop-on, hop-off bus tour providers.  In fact, Coach and City Sights have long marketed many of the tours offered by these other providers in combination with their own hop-on, hop-off bus tours, indicating that Defendants do not view these products as close competitors to or substitutes for their hop-on, hop-off bus tours.

45.     New York City is a relevant geographic market under Section 7 of the Clayton Act, Section 1 of the Sherman Act, and Section 340 of the Donnelly Act.  All of the major attractions visited by hop-on, hop-off bus tours and demanded by visitors to New York City are located within New York City, and hop-on, hop-off bus tour providers must operate in New York City to vie for the patronage of the city's visitors.

## VI. ANTICOMPETITIVE EFFECTS

46.     The market for hop-on, hop-off bus tours in New York City is highly concentrated and has become even more concentrated as a result of Defendants' joint venture.  The combination of the Coach and City Sights operations into Twin America is an effective merger to monopoly that has resulted in an entity with over 120 double-decker buses and approximately 99 percent of the relevant market.  The market concentration creates a presumption that the joint venture substantially lessens competition.

47.     As articulated in the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission ("Guidelines"), the Herfindahl-Hirschman Index

15

("HHI") is a measure of market concentration.[1]  Market concentration is often one useful indicator of the likely competitive effects of a merger.  The more concentrated a market, and the more that a transaction would increase concentration in a market, the more likely it is that a transaction would result in harm to consumers.  The Guidelines deem a market in which the HHI is above 2,500 points to be highly concentrated.  Transactions that increase the HHI by more than 200 points in highly concentrated markets will be presumed likely to enhance market power.

48.     In the year prior to Twin America's formation in March 2009, according to Coach's estimates, Coach held a market share of approximately 65 percent and City Sights held a share of approximately 34 percent.  Big Taxi Tours held no more than a 1 percent share.  Prior to the joint venture, the HHI for this market exceeded 5,000, and the formation of Twin America increased the market's HHI to approximately 9,800.  The increase in HHI of over 4,000 points resulting from the joint venture is far greater than the 200 point change that renders a transaction presumptively anticompetitive under the Guidelines.

49.     The formation of Twin America eliminated the intense head-to-head competition between Coach and City Sights.  As discussed above, because each company closely monitored the other's services and battled for market share, the competition between Coach and City Sights provided tangible benefits for consumers with respect to prices and new product offerings.  The

---

[1] *See* U.S. Dep't of Justice and Federal Trade Commission, Horizontal Merger Guidelines § 5.3 (2010), available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 =$ 2,600).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

elimination of this competition increases the likelihood that City Sights and Coach will raise prices and refrain from improving their product offerings.

50.     In addition to these likely anticompetitive effects, the formation of Twin America has resulted in actual anticompetitive effects.  Consistent with months of internal transaction-related documents outlining plans for a 10 percent fare increase in connection with the joint venture, both Coach and City Sights increased base fares by $5 (approximately 10 percent) in early 2009.  The price increase was part of, and was enabled by, the joint venture.  Indeed, as of February 23, 2009, over two weeks after the increase, Coach executives represented to Stagecoach's Board of Directors that the 10 percent fare increase was connected to the pending joint venture and that absent the Transaction there would be "[n]o fare increase (due to competition)."

## VII.  LACK OF ENTRY AND EFFICIENCIES

51.     It is unlikely that future entry or expansion will occur in a manner that is timely and sufficient to counteract the competitive harm caused by the Transaction.  In the more than three years of Twin America's operation, neither entry nor expansion has taken place to an extent that would sufficiently replace the competition lost by the combination of City Sights and Coach.

52.     Significant barriers exist to new entry.  In order to commence operations, an entrant must obtain approval from NYCDOT to pick up and drop off passengers at specified bus stops along its proposed tour route.  Defendants obtained bus stop authorizations on a "first come, first served" basis several years ago and secured stopping rights directly in front of New York City's major tourist attractions.  Due in part to congestion and other traffic issues that have intensified in recent years, however, the majority of bus stops at major tourist destinations that have been requested by potential entrants have been denied, including stops at top attractions

such as the Empire State Building, Times Square, Macy's, the World Trade Center site, and
Battery Park. Moreover, where potential entrants have received stopping rights within the
vicinity of a key attraction, the stop has typically been located multiple blocks away. Without
the ability to stop (and enable passengers to hop on and hop off) at a critical mass of top tourist
attractions and neighborhoods, a would-be entrant cannot offer a hop-on, hop-off service that
meaningfully competes with Twin America's hop-on, hop-off bus tours.

53.     Even if a company were to overcome this obstacle and commence operations, it
would need to obtain and deploy a large fleet of buses and operate service at a high frequency in
order to offer "hop on" wait times similar to Twin America's. Without a large fleet of buses to
offer comparable wait times to Twin America's, a would-be entrant cannot provide a hop-on,
hop-off service that meaningfully competes with Twin America. These measures take time and
are costly to implement.

54.     Brand recognition is another important part of providing a hop-on, hop-off bus
tour business that would be able to effectively compete against Twin America. A lack of brand
recognition creates difficulties in establishing multiple distribution channels, selling advance
tickets to international customers, and obtaining cross-marketing partnerships. As Coach itself
recognized, "market entry requires the establishment of strong brands and critical mass." More
than three years have passed since the formation of Twin America without any company
surmounting these barriers.

55.     Expansion by Big Taxi has been minimal and not nearly on a scale sufficient to
reverse the Transaction's anticompetitive effects. Although it was established in 1999, Big Taxi
operates today with approximately six buses, rendering it unable to offer hop-on, hop-off bus
service at a frequency remotely comparable to or competitive with those offered by Twin

Case 1:12-cv-08989-ALC   Document 1   Filed 12/11/12   Page 19 of 24

America.  Whereas Twin America operates dozens of buses that pick up customers along the company's tour routes multiple times per hour, Big Taxi operates its primary loop with only three buses on an average day, causing extended wait times for customers attempting to hop off and hop back on.  Indeed, Big Taxi was not able to discipline Defendants' early 2009 price increase, and has not replaced the competition lost due to the formation of Twin America.

56.     Additionally, in the summer of 2012, a small company named Go New York Tours began operating approximately five hop-on, hop-off buses in New York City.  Like Big Taxi, Go New York's bus fleet is not large enough to offer hop-on, hop-off service at a frequency that competes meaningfully with Twin America's.  Moreover, the company has been unable to obtain from NYCDOT the critical mass of bus stop authorizations at top New York City attractions and neighborhoods needed to rival Twin America's tour offerings.

57.     Defendants cannot demonstrate cognizable and merger-specific efficiencies that are or would be sufficient to offset Twin America's anticompetitive effects.

### VIII.  VIOLATIONS ALLEGED

**FIRST CAUSE OF ACTION**
**(Violation of Section 7 of the Clayton Act)**

58.     Plaintiffs reallege and incorporate paragraphs 1 through 57 as if set forth fully herein.

59.     By entering into the Transaction, as defined in paragraph 12, Defendants formed and continue to operate the Twin America joint venture, the effect of which has been and will likely continue to be to substantially lessen competition and to tend to create a monopoly in the market for hop-on, hop-off bus tours in New York City, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

60.    Through Coach and City Sights contributing their New York City hop-on, hop-off bus tour operations and assets to the joint venture and acquiring an interest in Twin America, the Transaction has had, and will likely continue to have, the following effects, among others:

a)    competition between Coach and City Sights in the provision of hop-on, hop-off bus tours in New York City was, is, and will continue to be eliminated;

b)    competition generally in the provision of hop-on, hop-off bus tours in New York City was, is, and will continue to be substantially lessened;

c)    the prices of hop-on, hop-off bus tours in New York City did and will likely continue to increase to levels above those that would have prevailed absent the Transaction; and

d)    consumers were, are, and will continue to be deprived of benefits and features that would have existed but for the Transaction.

### SECOND CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

61.    Plaintiffs reallege and incorporate paragraphs 1 through 60 as if set forth fully herein.

62.    Coach's and City Sights's agreement to combine their hop-on, hop-off bus tour assets and operations through the Transaction, to eliminate competition between them, and to not compete against each other or against Twin America unreasonably restrains trade, and will likely continue to unreasonably restrain trade, in the market for hop-on, hop-off bus tours in New York City, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Transaction has and will likely continue to have the effects enumerated in paragraph 60.

### THIRD CAUSE OF ACTION
#### (Violation of Section 340 of the Donnelly Act)

63.     Plaintiff State of New York realleges and incorporates paragraphs 1 through 62 as if set forth fully herein.

64.     Coach's and City Sights's agreement to combine their hop-on, hop-off bus tour assets and operations through the Transaction, to eliminate competition between them, and to not compete against each other or against Twin America unreasonably restrains trade, and will likely continue to unreasonably restrain trade, in the market for hop-on, hop-off bus tours in New York City, in violation of Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340.

65.     The Transaction has and will likely continue to have effects as described in paragraph 60.

### FOURTH CAUSE OF ACTION
#### (Violation of Section 63(12) of the New York Executive Law)

66.     Plaintiff State of New York realleges and incorporates paragraphs 1 through 65 as if set forth fully herein.

67.     By forming and operating the Twin America joint venture in violation of Section 1 of the Sherman Act, Section 7 of the Clayton Act, and Section 340 of the Donnelly Act, the Defendants have engaged in repeated illegal acts in the carrying on, conducting, or transaction of business, in violation of Section 63(12) of the New York Executive Law, N.Y. Exec. Law § 63(12).

### IX.  PRAYER FOR RELIEF

68.     Plaintiffs request:

a)  that the Twin America joint venture be adjudged to substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

b)  that the Twin America joint venture be adjudged to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c)  that the Twin America joint venture be adjudged to unreasonably restrain trade in violation of Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340;

d)  that the Twin America joint venture be adjudged to violate Section 63(12) of the New York Executive Law;

e)  that Coach and City Sights be ordered to dissolve the joint venture, or, in the alternative, that Twin America be ordered to divest a business approximating the pre-venture City Sights, including that brand;

f)  that Coach and City Sights be permanently enjoined from combining, in any form, the Gray Line New York and City Sights hop-on, hop-off bus tour businesses;

g)  that Plaintiffs shall have such other relief, including equitable monetary relief, as the nature of this case may require and as is just and proper to dissipate the anticompetitive effects of this violation and to deter future violations;

h)  that the State of New York receive reasonable attorneys' fees; and

i)  that Plaintiffs recover the costs of this action.

DATED:  December //, 2012

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____
Renata B. Hesse
Acting Assistant Attorney General

_____
Sarah L. Wagner
David E. Altschuler
Michele B. Cano
John W. Elias
Mark J. Niefer

_____
Leslie C. Overton
Deputy Assistant Attorney General

U.S. Department of Justice
Antitrust Division
Transportation, Energy &
    Agriculture Section
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 305-8915
Facsimile: (202) 616-2441
sarah.wagner@usdoj.gov
david.altschuler@usdoj.gov
michele.cano@usdoj.gov
john.elias@usdoj.gov
mark.niefer@usdoj.gov

_____
Patricia A. Brink
Director of Civil Enforcement

_____
William H. Stallings
Chief
Transportation, Energy &
    Agriculture Section

_____
Kathleen S. O'Neill
Assistant Chief
Transportation, Energy &
    Agriculture Section

_____
Benjamin Sirota
Antitrust Division
New York Field Office
26 Federal Plaza, Room 3630
New York, NY 10278
Telephone:  (212) 335-8056
Facsimile:  (212) 335-8023
benjamin.sirota@usdoj.gov

_____
Deirdre A. McEvoy
Chief
New York Field Office

Attorneys for Plaintiff United States

_____
Wendy H. Waszmer
Assistant Chief
New York Field Office

FOR PLAINTIFF STATE OF NEW YORK:
Eric T. Schneiderman
Attorney General

By:

_____
C. Scott Hemphill
Chief, Antitrust Bureau

_____
James Yoon
Assistant Attorney General

_____
Matthew Siegel
Assistant Attorney General

Office of the Attorney General
Antitrust Bureau
120 Broadway, 26th Floor
New York, NY 10271-0332
Telephone: (212) 416-8282
Facsimile: (212) 416-6015
Scott.Hemphill@ag.ny.gov
James.Yoon@ag.ny.gov
Matthew.Siegel@ag.ny.gov

Attorneys for Plaintiff State of New York

24